W. J. LAKE & CO., INC. ET AL. *v.* UNITED STATES (No. 4285)[1]

---

[1] C. A. D. 94.

United States Court of Customs and Patent Appeals, January 4, 1940

*Lawrence & Tuttle (George R. Tuttle* of counsel) for appellants.
*Webster J. Oliver,* Assistant Attorney General *(John J. McDermott* and *Samuel D. Spector,* special attorneys, of counsel) for the United States.

[Oral argument December 12, 1939, by Mr. Tuttle and Mr. Spector]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Third Division) overruling two protests, one by appellant

Lake & Co. and the other by appellant Bush & Co., acting for appellant Lake & Co., against the classification by the collector at the ports of Seattle and Bellingham, Washington, of certain imported merchandise as vegetable oil cake meal under the provisions of paragraph 730 of the Tariff Act of 1930, and assessment of duty upon such merchandise at the rate of 3/10 cents per pound under said paragraph.

The protests claimed the merchandise to be free of duty under paragraph 1685 as a substance used chiefly for fertilizer, or chiefly as an ingredient in the manufacture of fertilizers; or in the alternative, free of duty under paragraph 1689 of said act.

The merchandise consists of two types of oil cake meal. One is composed of a mixture of 95 per centum soya bean oil cake meal and 5 per centum castor seed cake meal, and the other a mixture of 95 per centum peanut cake meal and 5 per centum castor seed cake meal. The bags containing the merchandise were marked "Poison."

The pertinent provisions of the paragraphs here involved read as follows:

PAR. 730. * * * all other vegetable oil cake and oil-cake meal, not specially provided for, three-tenths of 1 cent per pound; * * *.

PAR. 1685. [Free List] Guano, basic slag (ground or unground), manures, and (notwithstanding any other provision of this Act) those grades of all other sub-. stances used chiefly for fertilizers, or chiefly as an ingredient in the manufacture of fertilizers.

PAR. 1689. [Free List] Hide cuttings, raw, with or without hair, ossein, and all other glue stock.

Before the Customs Court the protests were consolidated for purposes of trial. Three witnesses testified in behalf of appellants and two in behalf of the Government.

One Lyle Branchflower testified that he had been vice-president and manager of the feeding and fertilizer meals division of Lake & Co.; that he handled for that company the buying and selling of such meals, and had been engaged in the feed and fertilizer business since 1921; that the involved merchandise was imported from China; that he specified that the mixture imported should contain 5 per centum castor seed meal; that his company had handled "a good many thousand tons a year" of organic feeds and fertilizers; that he had sold such feeds and fertilizers "All along the Pacific coast and through the Mountain States;" that the involved merchandise was sold to the Casein Manufacturing Co.; that the residue resulting from the use of the merchandise by the Casein Manufacturing Co. was bought by Lake & Co. and was sold for fertilizer. The witness further testified as follows:

Q. Have you ever, in your experience, since 1921, known of a mixture of peanut cake meal or soya bean cake meal, when mixed with castor seed meal, to be used as a feeding product?—A. No, sir; not to my knowledge.

Q. Do you know whether such merchandise would be suitable for that use?—A. *I don't know. I do know it would be impossible to sell it here.*

Q. Have you ever known it to be done during the years with which you have been familiar with it?—A. No, sir.

Q. Would you ever offer such a mixture for feeding purposes?—A. No, sir.

Q. Based on your experience, do you know what the use of such a mixture would be?—A. *Either for fertilizer or glue stock. They would be the only purposes.* [Italics supplied.]

Upon cross-examination the witness testified as follows:

X Q. For how many years have you handled soya bean cake meal mixed with 5 per cent castor seed cake meal?—A. Well, these are the only shipments I have knowledge of of meal made up in that manner.

X Q. These are the first shipments you ever handled of soya bean cake meal, plus a combination of 5 per cent castor seed meal?—A. Yes.

X Q. And you sold this shipment to the Cascin Manufacturing Company?—A. Yes.

X Q. Have you ever handled cotton seed meal?—A. Yes.

X Q. For how long a period of time?—A. Since 1921.

X Q. And have you sold cotton seed meal as feed or fertilizer?—A. Well, we buy some and most of it that we bought we have sold for both purposes. The same meal is used for both purposes.

X Q. Have you seen cotton seed meal used for both purposes at different times?—A. Yes.

X Q. Over a period of many years?—A. Yes.

X Q. Have you seen it used more often as feed than as fertilizer?—A. It depends on the area. In the southern states they use it more in balanced feed; in the northern states it is used more for fertilizer. It really depends on the section. In some areas, where it is cheaper, they use more of it. It is used for fertilizer more in the northern states.

The witness further testified that the involved importations were used in the manufacture of glue.

Frank Leckenberg, a witness for appellants, testified that for many years he had bought feeds and fertilizers from local and domestic dealers in the United States and from South America and the Orient; that he had sold such merchandise in the States of Oregon, California, and Washington, and occasionally in Idaho and Utah; that he had never known of mixtures such as are here involved prior to the importation of the involved merchandise; that he had never handled castor seed meal; that in 1934 and 1935 he was a director of the National Fertilizers Association. The witness further testified as follows:

Q. Mr. Leckenberg, have mixtures such as we have been talking about and described here, consisting of 95 per cent soya bean cake meal or peanut cake meal and 5 per cent castor seed cake meal ever been offered to you as feed?—A. No. They are offered as non-edible.

\* \* \* \* \* \* \*

Q. Have you any knowledge of the use of merchandise consisting of 5 per cent castor seed cake meal when mixed with 95 per cent or thereabouts of cotton seed meal?—A. No; no personal knowledge.

\* \* \* \* \* \* \*

Q. I understood you to say it was offered to you. Was it, to your knowledge, ever on the market in any of the years of your experience?—A. I don't know

about that exact preparation, but there was one which consisted principally of castor bean meal in a mixture used as fertilizer.

Q. A mixture of what was that?—A. Mixture of the castor bean meal and other organic substances and chemicals.

Q. Of vegetable oil cake meals?—A. Yes.

Q. What kind?  A. Principally cotton seed meal.

Q. Have you ever known of castor seed meal to be mixed with peanut cake meal or soya bean cake meal?—A. No.

Upon cross-examination the witness testified as follows:

X Q. I think you testified on direct examination that in some southern states castor seed meal is mixed with soya bean cake meal and used as fertilizer; is that correct?

Mr. Tuttle. I don't believe the witness so testified.

A. I said cotton seed meal.

By Mr. McDermott.

X Q. Cotton seed meal mixed with castor seed meal used as fertilizer in some southern states; is that correct?—A. Yes.

X Q. When was that?—A. Why, within the last ten years.

X Q. In what States?—A. In Georgia, Virginia, Louisiana.

X Q. Any other States?—A. Possibly; I am not sure of that.

X Q. How many years ago is that, roughly?—A. That would be within the last ten years, and not within the last three years.

X Q. *Have you ever seen soya bean oil-cake meal mixed with castor seed meal used by anybody?*—A. *No.*

X Q. *Have you ever seen soya bean oil-cake meal mixed with castor seed meal used in any manner?*—A. *No; I have not.*  [Italics supplied.]

C. S. Leonardson, a witness on behalf of appellants, testified that he was western manager of the Casein Manufacturing Co. of America, a manufacturer of glue; that the involved importations were purchased by said company from Lake & Co. and were used in the manufacture of glue, and that the residue resulting from said manufacture was sold to appellant Lake & Co.

Appellants rely upon both paragraphs claimed by them; that is, they contend that the merchandise is free of duty under paragraph 1685 because it is chiefly used for fertilizer, or that it is free of duty as glue stock under paragraph 1689.

With respect to appellants' claim that the involved merchandise is free of duty under paragraph 1685 as a substance used chiefly for fertilizer, we find nothing in the record to substantiate this claim. None of the witnesses had any knowledge of any use of merchandise such as is here involved prior to the importations here in question, and these importations were used in the manufacture of glue; only the residue of such manufacture was sold for fertilizer.

It is well established that where the statute provides that the thing designated shall be classified under a given provision only if chiefly used for a specified purpose, use must be determined as of the date of the importation of the particular merchandise involved, or immediately

prior thereto, while the common or commercial meaning of an *eo* *nomine* designation in a tariff act must be determined as of the effective date of that act. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762, and cases therein cited.

With respect to the claim under paragraph 1689 that the involved merchandise is classifiable as glue stock, there is no evidence in the record that merchandise of the character here involved was, at the time of the enactment of the Tariff Act of 1930, glue stock. The term "glue stock" is a descriptive one, and the meaning to be given to it is the meaning which it had at the time of the enactment of the act. *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932.

There is no evidence that merchandise of the character here involved was chiefly used for making glue at the time of the enactment of the Tariff Act of 1930.

Appellants, however, rely upon another rule of law considered by this court in the case of *United States* v. *Lyon & Healy*, 4 Ct. Cust. Appls. 438, T. D. 33873, wherein the court, after quoting from the decision of the Supreme Court in the case of *Magone* v. *Wiederer*, 159 U. S. 555, stated:

The Supreme Court in the last-mentioned case seems to have adopted the generally accepted rule that chief use in such cases may be shown either by the character of the article itself, as imported, wherein it is evidenced that it is intended and susceptible to but a single use, declared by the statute, or that it may be shown by proof that it is intended and serviceable substantially for the purpose alone declared by the statute within the terms of which it is claimed to be dutiable. That is to say, that it may be brought within the terms of the statute either by evidence manifested by the articles *per se* or given at the trial. That is the accepted doctrine and the one which has received the approval of this court. * * *

Appellants' brief, after quoting the foregoing, states:

Under this decision chief use may be found from evidence that the article is intended and serviceable substantially for the single purpose declared by the statute. It is by virtue of this rule that the present merchandise is claimed free of duty.

Upon this branch of the case we find that the former vice-president and manager of appellant Lake & Co., when asked if merchandise of the character of that here involved would be suitable for use as a feeding product, testified:

I don't know. I do know it would be impossible to sell it here.

It is true that he later testified as follows:

Q. Based on your experience, do you know what the use of such a mixture would be?—A. Either for fertilizer or glue stock. They would be the only purposes.

Attention is called to the testimony of this witness hereinbefore quoted that "these are the only shipments I have knowledge of of meal made up in that manner." The witness further testified with respect to his understanding of the term "glue stock" as follows:

R. Q. I believe in your cross examination, Mr. McDermott asked you about the manufacture of glue stock. The words "glue stock" to you, do they mean a substance used in making glue, or is it something you manufacture and by that process becomes glue stock?—A. No. Glue stock, to my way of thinking, is a by-product or material that you obtain from operations on some other product. It is the residue that is available or that can be used for the manufacture of glue.

Appellants' witness Leckenberg, formerly vice-president of Charles H. Lilly, dealing in feeds and fertilizers, testified that he had never offered for sale mixtures such as here involved, and that his acquaintance with such mixtures was confined to the instant importations. While the witness testified that these mixtures are offered as non-edible, he also testified that he had never known castor seed meal to be mixed with peanut cake meal or soya bean cake meal. This is seemingly in contradiction of his previous testimony, but we assume that the witness intended to say that he had never known of such mixtures other than the importations involved. With respect to the term "non-edible" used by the witness, we would observe that the word "edible" usually means fit for human consumption. *United States* v. *Yick Shew Tong Co.*, 25 C. C. P. A. (Customs) 255, T. D. 49392.

There is no other testimony material to this point other than that respecting the actual use of the involved importations, which admittedly were used in the manufacture of glue.

We think this testimony falls far short of bringing the case at bar within the principle considered in the case of *United States* v. *Lyon & Healy, supra*. These mixtures were ordered by the witness Branchflower, but he gave no reason for ordering these particular mixtures. It may be that his purpose in specifying as one of the ingredients 5 per centum of castor seed meal was to render the mixture useless for any purpose other than for fertilizer or glue stock; but he did not state, nor is there any testimony in the record, as to why the involved mixtures are not suitable for use as a feeding product. We are left only to conjecture as to why they may be "intended and serviceable substantially for the purpose alone declared by the statute," in this case glue stock, assuming without deciding that if an article has two nonanalogous uses, the principle considered in the *Lyon & Healy* case would be applicable.

If the addition to soya bean cake meal or peanut cake meal of 5 per centum castor seed meal renders them unfit for more than one or possibly two uses, there should have been testimony from witnesses qualified to speak upon that subject.

254

Instead we have merely the actual use of the involved importations and the testimony of two witnesses who were not qualified, or if qualified the record does not show it, to state why the involved merchandise was susceptible of use only for glue stock or for fertilizer. Of course the actual use of the involved importations cannot be determinative of the issue. *Bangor & Aroostook Railroad Co. et al.* v. *United States*, 20 C. C. P. A. (Customs) 96, T. D. 45724.

Finally, the mere fact that the bags containing the merchandise were marked "Poison," without any explanation of the reason therefor, is not of probative force in determining the character of the involved merchandise. The bags may, insofar as the record is concerned, have been previously used for containers of different merchandise that was poisonous.

For the reasons herein stated the judgment appealed from is *affirmed.*